IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DESHAUN HARRIS, | § | |
| | § | |
| | § | No. 408, 2022 |
| Defendant Below, Appellant, | § | |
| | § | |
| | § | Court Below: Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| | § | |
| STATE OF DELAWARE, | § | I.D. No. 2005002325A (K) |
| | § | |
| | § | |
| Appellee. | § | |

Submitted: May 3, 2023
Decided: July 14, 2023

Before **SEITZ**, Chief Justice; **VALIHURA**, and **TRAYNOR**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

Santino Ceccotti, Esquire, Office of the Public Defender, Wilmington, Delaware for Appellant.

Sean P. Lugg, Esquire, Delaware Department of Justice, Wilmington, Delaware for Appellee.

**VALIHURA**, Justice:

In this appeal, defendant-below, appellant Deshaun Harris ("Harris"), asserts that the Superior Court abused its discretion in admitting certain prison phone call recordings. We find no merit to the appeal and, accordingly, AFFIRM Harris's conviction and sentence.

## I.      Facts and Procedural History

### A. Facts[1]

In May 2020, William Baker ("Baker"), his mother, Christine Brittingham ("Brittingham"), his fiancée, Catrina Knotts ("Knotts"), and his brother, Dylan Wilkerson ("Wilkerson"), rented rooms 46 and 50 at the Kent Budget Inn in Dover, Delaware.[2] In the early afternoon of May 10, 2020, Baker responded to a knock on his door. Upon opening the door, he was immediately pistol whipped by two men. The two assailants, one of whom Baker identified as Harris, forced themselves into the room, demanded the occupants' belongings, and threatened to kill them if they did not comply.[3] Harris hit Baker, knocking him to the floor. Baker's mother, Brittingham, then stood up and moved toward Harris.[4]

---

[1] Citations in the form of "[Last Name] Trial Test. at [_]" refer to witness testimony from the trial transcript.

[2] App. to Opening Br. at A140–41 (Baker Trial Test. at B47–48). Most testimony refers to Room 50, but some testimony refers to Room 52.

[3] *Id.* at A141 (Baker Trial Test. at B48:18–22). Baker testified that the men said to him: "You know what it is. You know what we're here for. Give us all your shit or we're going to kill you." *Id.*

[4] Brittingham testified that she was asleep in her hotel room when a "thump" woke her up. When she woke up, Harris was already in the room, Baker and Knotts were on the floor, and someone had a gun to Wilkerson's head. *Id.* at A233 (Brittingham Trial Test. at 18:1–5). She testified that she moved toward Harris to see "what was going on," when Harris struck her in the head and she fell over a dresser drawer, broke her ankle, and passed out for approximately 15 minutes. *Id.* (Brittingham Trial Test. at 18:6–10). Knotts testified along the same lines as Brittingham. Knotts stated: "Christine got up to – I don't know if she was going over to Deshaun or she was going to

2

Harris punched Brittingham in the head, knocking her to the floor. As she fell, her foot became caught under a nearby dresser, causing a compound fracture to her ankle. Harris then punched Baker's fiancée, Knotts, in the head twice and her face once, grabbed her purse, and ran out of the room. Meanwhile, the other assailant pointed a gun at Baker's brother, Wilkerson, and took his wallet, then ran out of the room after Harris. Baker chased after them, following them to an alley next to the motel where the two assailants got into a car and sped away. Baker pushed a shopping cart in front of the moving vehicle, but the car hit the cart and the car kept moving.

When Dover Police officers responded to the scene a short time later, Baker informed Detective Mullaney of Deshaun Harris's identity and of Harris's involvement in the robbery.[5] Detective Mullaney viewed the motel surveillance videos depicting "an individual that resembled a Deshaun Harris" that Officer Mullaney had previously encountered.[6] He testified that he had seen Harris on several prior occasions wearing the same type of tan "Carhartt" coat.[7] Thereafter, Detective Mullaney obtained a photograph

---

the bathroom, and that's when Deshaun hit her and she fell. And when she fell, she hit her ankle on the side of the drawer and it started bleeding, cut it open." *Id.* at A189 (Knotts Trial Test. at B96:2–7). Wilkerson also testified that Brittingham "stood up and then she got punched." *Id.* at A74 (Wilkerson Trial test. at A61:12). After she got punched, "she landed on the floor" and "there was blood pouring out of her leg." *Id.* at A76 (Wilkerson Trial. Test. at A63:15, 22–23). Baker testified that Brittingham was attempting to hit Harris when Harris knocked her down. *Id.* at A142 (Baker Trial Test. at B49:1–7).

[5] *Id.* at A145–46 (Baker Trial Test. at B52–53). When asked at trial how certain he was that it was Mr. Harris, Baker responded, "[a] thousand percent." *Id.* at A146 (Baker Trial Test. at B53:1).

[6] *Id*. at A103–04 (Mullaney Trial Test. at B10:21–B11:3).

[7] *Id*. at A118 (Mullaney Trial Test. at B25:7–14). Detective Mullaney told the jury: "What I'm saying is through my previous encounters with Deshaun Harris, looking at the video, he matches

3

of Harris and showed it to Baker, who positively identified Harris. Detective Mullaney then secured a warrant for Harris's arrest. Dover Police arrested Harris five days later.

After Harris's arrest, before trial, Baker was confronted by individuals who offered him money to sign papers stating that Harris was not the perpetrator of the attack. They threatened Baker, warning him that if he testified on the stand or identified Harris, they would kill his family and him. At trial, the State produced three documents purporting to be affidavits of Baker recanting his identification of Harris. Each document was in a different format — one was written in cursive, one was printed, and one was typed. Baker testified that he did not draft any of the documents, but that he signed the typed affidavit under the threat of being killed.

During its investigation, the State found multiple prison phone calls between a person believed to be Harris and an unidentified woman. The State sought to introduce certain portions of the calls to corroborate Baker's testimony and to contextualize the three affidavits wherein Baker had recanted his identification of Harris. Harris argued that their admission violated Delaware Rule of Evidence ("D.R.E.") 403.[8] Specifically, Harris objected to the admission of the recordings on the basis of identification, clarity, and the "highly prejudicial" fact that he was incarcerated at the time. The State argued the recordings were relevant, articulated the standard for authenticating the recordings, and

---

the physical attributes that I was able to view as well as the clothing that I have seen Deshaun Harris wear." *Id.* at A118–19 (Mullaney Trial Test. at B25:23–B26:3).

[8] *Id.* at A203–13 (Trial Transcript at B110–20).

countered that the probative value of the evidence outweighed any potential unfair prejudice.

The Superior Court admitted the recordings over Harris's objection. But to minimize any unduly prejudicial effect, it ordered that the recordings be edited to remove the reference to the company that handles the prison recordings. It also ordered counsel to meet and confer regarding the preparation of a transcript of the recordings.[9] Further, the court indicated that a limiting instruction would be given regarding the jury's use of the prison call recording.[10] As a result, the recording was reduced to approximately nine minutes and the parties presented an agreed-upon transcript of the recording to the trial court. The Superior Court admitted the recording as State's Exhibit 14 and permitted the jury to read the agreed-upon transcript as they listened to the recording.

Further, Harris stipulated "that from May 27, 2020 to June 30, 2020, [he] was committed to a detention center."[11] In view of this stipulation, the trial judge instructed the jury not to draw any inference "that because of this incarceration, the defendant is a bad

---

[9] *Id.* at A224–25 (Trial Transcript at B131:20–B132:1).

[10] *Id.* at A225 (Trial Transcript at B132:2–3). Later, the Superior Court instructed the jury as follows:

> With the agreement of both parties and the approval of the Court, there is an audio recording in evidence that has been edited to remove material that is not relevant to your decision in this case. You should not speculate about the nature of the irrelevant material that has been removed, the edited material has no bearing upon this case.

*Id.* at A259 (Trial Transcript at 123:19–124:2).

[11] *Id.* at A242 (Trial Transcript at 55:9–11).

5

person, disreputable or that he is somehow more likely to have committed the crimes for which he has been accused."[12]

### B. Procedural History

On September 8, 2020, approximately four months after Harris's May 2020 arrest, a Kent County grand jury indicted Harris on charges related to the May 10 robbery. On May 3, 2021, a Kent County grand jury returned a final, superseding indictment charging Harris with: Robbery First Degree (2 counts), Assault First Degree, Possession of a Firearm During the Commission of a Felony ("PFDCF"), Burglary First Degree, Possession of a Firearm by a Person Prohibited ("PFBPP"), Aggravated Menacing, Wearing a Disguise During the Commission of a Felony, Conspiracy Second Degree (2 counts), Assault Third Degree (2 counts), Theft, Aggravated Act of Intimidation, and Breach of Conditions of Bond During Commitment.[13]

The Aggravated Act of Intimidation, Breach of Conditions of Bond During Commitment, and related conspiracy charges were added after the State's discovery of the prison phone call recordings. Specifically, Counts 13 and 14 charged as follows:

COUNT 13   (Aggravated Act of Intimidation)

DESHAUN J. HARRIS, on or between the 10th day of May, 2020 and the 23rd day of April 2021, in the County of Kent, State of Delaware, did knowingly and with malice prevent or dissuade or did attempt to prevent or dissuade William Baker, a victim or witness to a crime, from attending or giving testimony at any trial, proceeding, or inquiry authorized by law and is accompanied by an express or implied threat of force or violence upon William Baker, or the property of said victim, witness or third person.

---

[12] *Id.* at A258 (Trial Transcript at 121:14–21).

[13] App. to Answering Br. at B1–7 (Superseding Indictment).

COUNT 14 (Breach of Conditions of Bond During Commitment)

DESHAUN J. HARRIS, on or between the 10th day of May, 2020 and the 23rd day of April 2021, in the County of Kent, State of Delaware, having been committed in lieu of bail in connection with one or more charges of a felony prior to trial, did knowingly breach a condition imposed in connection with that bail by having contact with William Baker after a no contact order was entered.[14]

Harris's case proceeded to a jury trial in the Superior Court beginning on September 8, 2021. Immediately before the start of trial, the court granted Harris's motion to sever the PFBPP charge from the remaining charges. After a four-day trial, on September 14, 2021, the jury found Harris guilty of two counts of Robbery First Degree, Assault Second Degree (as a lesser included offense of Assault First Degree), Burglary First Degree, Wearing a Disguise During the Commission of a Felony, two counts of Conspiracy Second Degree, two counts of Assault Third Degree, Theft, Aggravated Act of Intimidation, and Breach of Conditions of Bond During Commitment, and not guilty of PFDCF, Assault First Degree, and Aggravated Menacing.[15] Because the jury had found Harris not guilty of PFDCF, the State dismissed the previously severed PFBPP charge. The Superior Court ordered a presentence investigation and scheduled sentencing for a later date. On October 10, 2022, the Superior Court sentenced Harris to an aggregate 29 years of Level V incarceration followed by decreasing levels of supervision. Harris appealed.

---

[14] *Id.* at B6 (Superseding Indictment).

[15] App. to Opening Br. A272–76 (Verdict Transcript, dated Sept. 14, 2021).

## II.    Issue on Appeal

Harris contends that the trial court abused its discretion when it admitted the prison recordings over defense counsel's objection that the probative value of the calls did not outweigh the highly prejudicial nature of the calls. He challenges the trial court's conclusions both as to the probative value of the recordings and as to their prejudicial nature. *First*, he argues that the probative value of the prison phone call recordings was minimal and speculative because large portions of the transcribed calls are inaudible, and the voices heard on the calls were not properly authenticated. Moreover, in Harris's view, it was improper for the trial court to allow the jury to use a transcript of the tape to interpret the inaudible portions of the phone calls. *Second*, Harris contends that the phone call recordings were unduly prejudicial because they made the jury aware that Harris was previously incarcerated, undermining the constitutionally guaranteed presumption of Harris's innocence, and potentially allowing the jury to convict Harris on an improper basis.

Harris asserts that this evidentiary error deprived him of his constitutional due process right to a fair trial, and that without the admission of the recordings, there is a reasonable probability that the verdict would have been different. Accordingly, Harris asserts that reversal of his convictions is required.

### III. Standard of Review

This Court reviews "a trial court's decision on the admissibility of evidence under an abuse of discretion standard."[16] "An abuse of discretion occurs when a court has exceeded the bounds of reason in light of the circumstances, or so ignored recognized rules of law or practice so as to produce injustice."[17]

### IV. Discussion

After a review of the record and Harris's argument on appeal, we conclude that the Superior Court did not abuse its discretion in admitting the prison phone call recordings that revealed Harris's efforts to influence a witness's participation in his trial.

#### A. D.R.E. 403

"Evidence must be relevant to be admissible at trial."[18] "Relevant evidence is admissible unless [a statute, these Rules, or other rules applicable in the Courts of this State] provides otherwise."[19] "Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."[20] "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:

---

[16] *Hines v. State*, 248 A.3d 92, 99 (Del. 2021) (citing *Rivers v. State*, 183 A.3d 1240, 1243 (Del. 2018).

[17] *McCrary v. State*, 290 A.3d 442, 454 (Del. 2023) (citing *Thompson v. State*, 205 A.3d 827, 834 (Del. 2019)).

[18] *Stickel v. State*, 975 A.2d 780, 782 (Del. 2009) (citing D.R.E. 402 (2009)).

[19] D.R.E. 402.

[20] D.R.E. 401.

unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[21] "The determinations of relevancy and unfair prejudice are 'matters within the sound discretion of the trial court, and will not be reversed in the absence of clear abuse of discretion.'"[22]

Here, the focus of this appeal is the Superior Court's balancing of the probative value of the recordings against their prejudicial effect. In ruling on Harris's evidentiary challenge under D.R.E. 403, the Superior Court carefully considered the contentions of the parties in this balancing exercise. In a concise oral bench ruling, the Superior Court ruled as follows:

> So it seems to the Court that the issue with regard to the prison calls turns on, really, a singular point; which is, whether or not the probative value is substantially outweighed by unfair prejudice to the defendant.
>
> Delaware Uniform Rule of Evidence 403 requires this Court to exclude relevant evidence if its probative value is substantially outweighed by unfair prejudice to a defendant.
>
> Two of the charges outlined in the indictment in this case involve witness tampering or intimidation. Further, there is both testimonial evidence and documentary evidence regarding contact made with Mr. Baker regarding his attendance and testimony in court today.
>
> The jury was alerted at the outset of this case that one of the indicted charges was breach of conditions of bond during commitment, so the jury already knows at some point the defendant was incarcerated.

---

[21] D.R.E. 403.

[22] *Gallaway v. State*, 65 A.3d 564, 569 (Del. 2013) (quoting *Mercedes-Benz of N. Am. Inc. v. Norman Gershman's Things to Wear, Inc.*, 596 A.3d 1358, 1366 (Del. 1991)).

10

The Court concludes that the State has sufficiently articulated witness tampering as the applicable government interest requisite to admission of the recorded prison calls. They will be admitted.[23]

As explained below, we agree with the Superior Court's analysis and find no abuse of discretion.

### 1. Probative Value

As set forth above, Harris's indictment charged him with, among other things, crimes related to his efforts to dissuade a witness from testifying against him at his trial for the robbery.[24] The phone call recordings introduced at trial were probative of the central elements of those crimes.

Baker testified that, after the robbery occurred, but before the trial began, individuals approached him, offered him $500 to sign three affidavits recanting his identification of Harris, and threatened his life if he refused to do so.[25] In fear for his life and his family's life, Baker went with the individuals to the Dover Federal Credit Union and signed a document in which he "recant[ed] any statements [he] made against Deshaun J. Harris on May 10, 2020."[26] At trial, however, Baker testified that the statements in the document were not true and that Harris was in fact one of the two people who attacked and robbed his family in the motel room.[27]

---

[23] App. to Opening Br. at A223–24 (Trial Transcript at B130:21–B31:19).

[24] App. to Answering Br. at B6–7 (Superseding Indictment).

[25] App. to Opening Br. at A155 (Baker Trial Test. at B62:10–22).

[26] *Id.* at A155–56 (Baker Trial Test. at B62:3–4, B63:1–2).

[27] *See e.g.*, *id.* at A152 (Baker Trial Test. at B59:15–18) ("Q: And so is that statement your statement? A. No. Q. Is that statement accurate? A. No.").

11

The transcripts of the recordings of prison phone calls made between May 27, 2020 and June 30, 2020 reflect a dialogue between an unidentified woman and a man, who introduces himself as Shaun, and uses Deshaun Harris's State Bureau of Identification (SBI) number. In the conversations, the two discuss, among other things, that the woman has been trying to induce an unnamed man to sign a statement she prepared, what format the statement needed to be in (cursive, printed, or typed),[28] that "he got in a car and went to his bank" to sign the statement,[29] and that there was an exchange of "$500 cash."[30] In short, the prison phone call recordings corroborated Baker's description of the efforts to dissuade him and provided context to the three forms (cursive, printed, and typed) of affidavits purporting to recant Baker's identification of Harris.[31]

This Court has previously recognized the probative value of prison phone call recordings in the context of a challenge to their admissibility. In *Anderson v. State*, for example, the appellant argued that the Superior Court abused its discretion during his trial when it permitted the jury to hear recorded prison phone calls wherein he made statements that, according to the State, were intended to solicit family members to tamper with witnesses.[32] This Court agreed with the Superior Court's finding that "[t]he statements in the phone calls could easily be construed to demonstrate a consciousness of guilt and also

[28] App. to Answering Br. at B14–18 (Transcript of Phone Call Recordings at 6–10).

[29] *Id.* at B21–22 (Transcript of Phone Call Recordings at 13:24–14:1).

[30] *Id.* at B25 (Transcript of Phone Call Recordings at 17:6).

[31] *Id.* at B8–26 (Transcript of Phone Call Recordings); App. to Opening Br. at A151–56 (Baker Trial Test. at B58–63).

[32] *Anderson v. State*, 197 A.3d 1049, 2018 WL 6068736, at *1 (Del. Nov. 20, 2018) (TABLE).

12

the intention to intimidate witnesses."[33]  Accordingly, we held that the Superior Court did

not abuse its discretion in admitting the prison recordings.  Here, we conclude that the

Superior Court did not err in concluding that the statements in the prison phone call

recordings were corroborative of Baker's testimony and probative of the charged crimes

where two of the charges in the indictment involve witness tampering or intimidation.

### a. Clarity

On appeal, Harris argues that the recordings lacked probative value because large

portions of the transcribed calls are inaudible.[34]  To the extent that the clarity of the

recording could undermine the probative value of the recordings, or confuse the jury, the

Superior Court addressed that concern by directing the parties to prepare an agreed-upon

transcript.[35]  In the final portion of its oral bench ruling, the Superior Court stated:

> I think there is a potential secondary 403 issue with the clarity of the call.  So
> counsel will need to confer.  You can barely hear the male person on that

---

[33] *Id. See also Whitehurst v. State*, 83 A.3d 362 (Del. 2013).  In *Whitehurst*, we affirmed the admission of prison recordings corroborating testimony of witness tampering.  There, the defendant-below, appellant argued both that the collection of the phone call recordings violated his Fourth and First Amendment rights, and that the introduction of the phone recordings tainted his trial.  Because we found the defendant's constitutional claims to be without merit, we did not reach his secondary argument that the allegedly inadmissible evidence tainted his trial. *Id.* at 363. *See also Waters v. State*, 242 A.3d 778, 783–84 (Del. 2020) (affirming defendant's murder conviction and rejecting defendant's argument that the Superior Court erred in admitting prison phone call recordings because the Attorney General's subpoena violated the Fourth Amendment).

[34] Opening Br. at 9.  In his reply brief, Harris raises the additional argument that the prison call recordings and the prepared transcripts were needlessly cumulative and confusing given that Baker testified as to the contact, threats, and affidavits.  Reply Br. at 1–2.  Because Harris failed to raise this argument in his opening brief, it is waived.

[35] App. to Opening Br. at A224–25 (Trial Transcript at B131:20–B132:1) ("The recording will be edited to remove the GTL reference, and counsel will meet and agree on a transcript of the recording, a copy of which will go back to the jury with the recording.").  The court ruled further that "a limiting instruction will be given regarding the jury's use of the prison recording." *Id.* at A225 (Trial Transcript at B132:2–3).

13

phone call. It's difficult to hear. And so that needs to be remedied. The remedy that the Court can come up with given the probative value of what is able to be discerned on those calls is that you all meet and confer and come up with a transcript, and that will accompany the prison call.[36]

Both parties agreed on the transcript and to allow the jurors to use the transcript to read along as they listened to the recording.[37] Harris's response that, had the trial court properly excluded the recordings, there would have been no need for the transcript in the first instance, is unavailing.[38] Given the probative value of the recordings, it was proper for the trial court to fashion a method by which to admit the evidence and to minimize any resulting prejudice.[39] The method ultimately used to address the clarity was reasonable as evidenced by the parties' agreement to it.

### b. Authentication

Next, Harris argues that the recordings lacked probative value because the male voice was not properly authenticated as belonging to Harris. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."[40] "The

---

[36] *Id.* at A225 (Trial Transcript at B132:6–13).

[37] *Id.* at A237 (Trial Transcript at 35–38). The trial court asked defense counsel if she had any objection to providing the transcript to the jury as they listened to the recording at trial, as opposed to providing it during deliberations. Defense counsel responded that she "believe[d] that's the correct way to handle it." *Id.* (Trial Transcript at 37:10–16). The transcript is in the State's Appendix at B8–26.

[38] Reply Br. at 1.

[39] *Concord Towers, Inc. v. Long*, 348 A.2d 325, 326 (Del. 1975) ("[T]he Trial Court must balance its duty to admit all relevant and material evidence with its duty to enforce standards of fairness and the Rules of Court.").

[40] D.R.E. 901(a).

burden of authentication is easily met.  The State must establish a rational basis from which the jury could conclude that the evidence is connected with the defendant."[41]

The State met its burden of authentication when it offered the testimony of Timothy Martin ("Martin"), the legal service administrator for the Department of Correction and the custodian of prison phone call records.[42]  Martin testified that he pulled the call recordings associated with Harris between May 27, 2020 and June 30, 2020, identified the certificate of authenticity of records introduced by the State, and explained that the recording system requires the inmate to log on with their SBI number and then repeat a phrase for voice identification.[43]

The authenticity of the recordings is further established through their content and context.[44]  A male voice, using Harris's SBI number was heard speaking with a woman regarding efforts to convince a man to recant his identification of Harris as one of the

[41] *Morris v. State*, 210 A.3d 724, 2019 WL 2123563, at *6 (Del. May 13, 2019) (TABLE) (citing *Cabrera v. State*, 840 A.2d 1256, 1264–65 (Del. 2004) (en banc)).

[42] *See* App. to Opening Br. A235–38 (Martin Trial Test. at 27–40); *see also* D.R.E. 901(b)(1), (b)(4), (b)(6), (b)(7); *Morris*, 2019 WL 2123563, at *6 (finding that "the Superior Court acted within its discretion" in finding that the State had properly authenticated prison phone call recordings where it considered "testimony explaining how the telephone system functions, including its need to verify the inmate's voice before placing a call, how [the police officer] obtained the records and recordings using [defendant's] SBI number, and how the call log was connected to the recordings [the officer] gave to the State" as well as the victim's testimony identifying the voices on the call).

[43] App. to Opening Br. at A235–36 (Martin Trial Test. at 27–30).

[44] *See, e.g., Parker v. State*, 85 A.3d 682, 688 (Del. 2014) (acknowledging that "Delaware follows the 'distinguishing characteristics' rationale," and "noting that Delaware courts have authenticated handwritten letters from inside prison based on the nicknames of the parties involved and references to the crimes"); D.R.E. 901(b)(4) ("Distinctive Characteristics and the Like.  The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances" satisfies authentication requirement).

individuals who participated in the motel room robbery. The discussion mentions a specific dollar amount being paid to the unnamed man — $500 — the number given by Baker in his testimony. Furthermore, these discussions heavily concerned the form of the affidavits and gave background to the reason that three different affidavits in three different formats exist, a unique circumstance. The evidence was sufficient to allow a juror to conclude that the recording was authentic.[45] Additionally, Harris was afforded the opportunity, of which he availed himself, to challenge the weight and credibility of the evidence.[46]

### 2. Danger of Unfair Prejudice

On the other end of the D.R.E. 403 balancing scale, Harris contends that the prison phone call recordings were unfairly prejudicial to him because they indicated to the jury that Harris was incarcerated at the time the calls were made, which undermined Harris's

---

[45] *See Parker*, 85 A.3d at 688 (The substance, timing, and context of social media post "was sufficient for the trial court to find that a reasonable juror could determine that the proffered evidence was authentic.") (citing D.R.E. 901(b)(4)). We disagree with Harris that the State's reliance on *Parker v. State* is misplaced. Although in *Parker* the evidence at issue was a social media post, rather than phone call recordings, the standard and basis for authentication is the same. In *Parker*, we held that "social media evidence should be subject to the same authentication requirements under the Delaware Rules of Evidence Rule 901(b) as any other evidence," *id.* at 687, and thus, like any other evidence, "the trial judge as the gatekeeper of evidence may admit the social medial post when there is evidence sufficient to support a finding by a reasonable juror that the proffered evidence is what its proponent claims to be." *Id.* at 688 (internal quotation omitted).

[46] D.R.E. 104(e) ("[Rule 104 – Preliminary Questions] does not limit a party's right to introduce before the jury evidence that is relevant to the weight or credibility of other evidence."). As a result of defense counsel's questioning during voir dire, the State stipulated to potential flaws in this identification system, stating that it could be possible to not give your name for the voice recording, and that if one did not say his or her name three different times that the call could still go through. App. to Opening Br. at A236 (Trial Transcript at 33:2–9).

16

constitutionally guaranteed presumption of innocence and could have led the jury to find him guilty on an improper basis. This argument lacks merit. For one, the jury was already, necessarily, made aware that Harris was incarcerated for a time because the charge for which Harris was on trial was Breach of Conditions of Bond During Commitment, an element of which is that the defendant be in custody. Moreover, Harris stipulated at trial that he was incarcerated at the time.[47] Finally, the trial judge properly instructed the jury to disregard any improper inference from the fact that Harris was incarcerated during the relevant time period.[48] Accordingly, the trial court did not abuse its discretion by finding that the probative value of the redacted and agreed upon transcript of Harris's prison calls, and the recordings of the phone calls, was not substantially outweighed by the danger of unfair prejudice.

---

[47] App. to Opening Br. at A242 (Trial Transcript at 55). Harris stipulated at trial that "from May 27, 2020 to June 30th, 2020, [he] was committed to a detention center." *Id.*

[48] *Id.* at A258 (Trial Transcript at 121:14–21). The Superior Court instructed the jury that:

> You have heard evidence that the defendant was incarcerated for a period of time. You are to draw no inference that because of this incarceration, the defendant is a bad person, disreputable, or that he is somehow more likely to have committed the crimes for which he has been accused. You are to draw no such inference from this evidence.

*Id. See also Bartell v. State*, 183 A.3d 1280, 2018 WL 1565636, at *2 (Del. Mar. 29, 2018) ("Bartell's concern that the jury could misuse the knowledge that he had been detained prior to trial is a valid one, but the trial court met his concern by instructing the jurors two separate times that they should not infer that pretrial detention has any bearing on his guilt.").

*V.      Conclusion*

For the above stated reasons, we conclude that the trial court did not abuse its discretion when it admitted the prison phone call recordings.  Accordingly, we **AFFIRM** the judgment of the Superior Court.